354 F.3d 1015
 Iris MENA, Plaintiff-Appellee, and
Jose E. Mena, Plaintiff,
v.
CITY OF SIMI VALLEY; Randy G. Adams; Marvin Hodges; Roy Jones; Vincent Allegra; Alan McCord; Richard Thomas; Ronald Chambers; William Lappin; Arnold Baynard; Jeffrey Dominick; Jack Greenburg; Richard Lamb; Frank Ahlvers; John Adamczyk; Tim Brown, Defendants, and
Darin L. Muehler; Robert Brill, Defendants-Appellants.
 No. 01-56673.
 United States Court of Appeals, Ninth Circuit.
 January 14, 2004.
 
 James S. Muller, Law Offices of James S. Muller, Los Angeles, CA; and Paul L. Hoffman, Esq., Schonbrun, Desimone, Seplow, Harris and Hoffman, LLP, Venice, CA, for Plaintiff-Appellee.
 James S. Muller, Law Offices of James S. Muller, Los Angeles, CA, for Plaintiff.
 David L. Nye, Esq., Nye Peabody & Stirling, Santa Barbara, CA, for Defendants.
 David L. Nye, Esq., and Karen K. Peabody, Esq., Nye Peabody & Stirling, Santa Barbara, CA, for Defendants-Appellants.
 Before: PREGERSON, REINHARDT, and ARCHER, Jr.[1], Circuit Judges.
 
 
 1
 ORDER DENYING PETITION FOR REHEARING AND SUGGESTION FOR REHEARING EN BANC
 
 ORDER
 
 2
 The panel has voted to deny the petition for rehearing and the suggestion for rehearing en banc.
 
 
 3
 The full court was advised of the suggestion for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the non-recused active judges in favor of en banc consideration. Fed. R.App. P. 35.
 
 
 4
 The petition for rehearing and the suggestion for rehearing en banc are denied.
 
 
 5
 KLEINFELD, Circuit Judge, with whom Circuit Judges KOZINSKI, O'SCANNLAIN, TALLMAN, BYBEE, and CALLAHAN join, dissenting from denial of rehearing en banc:
 
 
 6
 I respectfully dissent from the order denying rehearing en banc.
 
 
 7
 This is a qualified immunity case, arising out of the detention of a person in a home that was searched pursuant to a search warrant. The panel held that the police violated clearly established law, as any reasonable officer would have known, when they (1) detained a woman for two or three hours in a garage apartment while a search warrant in a shooting case was being executed in her house; and (2) asked her during the detention whether she was a U.S. citizen. The panel's first holding is contrary to Supreme Court authority. The second conflicts with a Seventh Circuit decision. Both holdings unreasonably interfere with sensible law enforcement and are unsupported by precedent. A reasonable police officer would not have known that either holding was the law, so the defendants were entitled to qualified immunity.
 
 
 8
 Iris Mena lived at her father's home. It was a single-family dwelling turned into a multi-family dwelling by taking in tenants who put individual locks on their doors. The Simi Valley police, with the help of the SWAT team, entered Mena's home to execute a search warrant. They were investigating a gang-related drive-by shooting. As part of that search, Mena was pulled from her bed by an officer, hand-cuffed, and led to her garage, where she was detained for the duration of the search. She was dressed in a long-sleeved shirt and sweat pants, but was barefoot for a while until an officer brought her shoes and a jacket. During Mena's detention, a local police officer and an INS agent, whom the Simi Valley police department had brought along because of the gang's significant illegal-alien membership, asked Mena about her citizenship and immigration status, including whether she had her documentation. When she responded that her papers were in her purse, the police officer took them out of the purse.
 
 
 9
 I. Asking about citizenship.
 
 
 10
 The panel creates the extraordinary new proposition of law that it is unconstitutional to ask a person detained for other reasons about her citizenship, without reasonable suspicion. After analyzing the reasonableness of her detention, the panel wrote that the inquiry into citizenship by itself violated a constitutional right, by unduly invading her privacy:
 
 
 11
 Furthermore, we note with particular emphasis that the officers unduly invaded Mena's privacy by inquiring unnecessarily into her citizenship status. The officers did so presumably because of Mena's apparent Hispanic/Latino ethnicity, because there was no reason evident in the record to be suspicious of her citizenship status. On these facts alone, we observe that Mena has alleged a violation of a constitutional right.[1]
 
 
 12
 No reasonable police officer would have imagined that this was the law, and no police officer ought to be prevented from asking about citizenship under these circumstances.
 
 
 13
 One is routinely and properly required to declare one's citizenship when driving back into Alaska from the Yukon Territory, getting off a plane from London at JFK, filling out the I-9 form that every employee is required to sign, and even applying for a fishing license. Yet in the panel's view, asking Mena the same question "unduly invaded Mena's privacy" in violation of the United States Constitution.[2] Far from knowing that this was clearly established law, the violation of which would result in a loss of qualified immunity, a reasonable police officer could not have imagined it. The panel raised and resolved this issue sua sponte; it was not briefed.[3] The officer asking the question was apparently interested in finding out whether Mena was illegally present in the United States, as many of the gang members were. Surely one constitutionally permissible goal of law enforcement is apprehension of persons whose presence in the United States is itself a crime.[4]
 
 
 14
 The panel suggests that an INS agent needs "particularized reasonable suspicion that an individual is not a citizen" before an INS agent can ask about citizenship and that, even then, a local police officer cannot ask unless the police department has entered into an agreement with the INS under 8 U.S.C. § 1357.[5] The whole notion, though, that there is something intimate and private about one's citizenship that is protected by the Fourth Amendment is wrong (the panel did not make a Fifth Amendment self-incrimination or custodial-interrogation argument).
 
 
 15
 The only other circuit to consider this question went the other way. In Martinez-Camargo v. INS,[6] the local police detained a man for working on his car in a vacant lot, and an INS agent asked him about his citizenship. The man revealed that he was an illegal alien. The Seventh Circuit held that there could be no Fourth Amendment violation because "[q]uestions... are neither searches nor seizures."[7] That obviously correct proposition should have been adopted by the panel here.
 
 
 16
 The panel relies instead on two traffic-stop cases, the Supreme Court decision in United States v. Brignoni-Ponce,[8] and our en banc decision in United States v. Montero-Camargo.[9] Neither case is on point. The gravamen of the interference with individual liberty in both was the stop, not the questioning. Both involved traffic stops of persons with Hispanic appearances near the Mexican border. The public interest in policing the border, in Brignoni-Ponce, was weighed against "the interference with individual liberty that results when an officer stops an automobile and questions its occupants,"[10] and the "interference with lawful traffic" of automobiles on the highway.[11] Likewise Montero-Camargo resolved whether ethnicity and other factors sufficed to establish "reasonable suspicion for the stop" of a car proceeding down the highway.[12]
 
 
 17
 By contrast, asking Mena about her citizenship did not require a stop. She was already stopped for an entirely independent reason. Her detention arose not at all from her ethnicity or the citizenship inquiry, but rather from her presence at a residence being searched pursuant to a search warrant. Because the questions about her citizenship did not require a stop (the detention already being accomplished) these two cases deciding the constitutionality of stops have no bearing on whether questioning Mena was constitutional.
 
 
 18
 Even if asking Mena about her citizenship was an unconstitutional invasion of her right to privacy, the officers would nevertheless be entitled to qualified immunity. To defeat qualified immunity, the panel would then have needed to establish that a reasonable officer would have known about this novel proposition of law.[13] I am unable to imagine the reasonable police officer that the panel envisions.
 
 
 19
 II. The detention.
 
 
 20
 The panel also holds that any reasonable officer would have known that it violated the Constitution to treat Mena as the officers in this case did. The problem with this holding is that, instead of following the Supreme Court's decision in Michigan v. Summers,[14] the panel expands the room Summers left for an exception so far as to eviscerate the rule. The panel based its holding of unconstitutionality, so obvious as to deprive the officers of qualified immunity on the manner of detention, on the fact that the officers "pushed Mena onto her and placed handcuffs on her," then "yanked her up from her bed by her shirt, and led her out of her room in her pajamas."[15] (According to Mena's own description of her clothes in her response to the petition for rehearing, she was actually wearing "green sweat pants, a black long sleeved shirt, and had no shoes on her feet.") And, "although it was raining outside and Mena was barefoot, the officers directed her outside and into a cold garage where she was detained for two to three hours."[16] (According to the petition for rehearing, the garage had been converted into a bedroom with beds and dressers.) Though the panel apparently concedes that handcuffing her at the outset was permissible, it takes the position that she should have been released from the handcuffs sooner than she was because "it was clear" that she, not being the drive-by shooting suspect, posed no threat to the officers.[17]
 
 
 21
 Michigan v. Summers holds that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted."[18] In Summers, as here, the police were executing a search warrant for a house, and, as here, there was no warrant or probable cause to search the individual at issue. Also, as here, the individual was detained while the house was searched. For several reasons, including that "[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation,"[19] and that "a neutral magistrate rather than an officer in the field has made the critical determination,"[20] the detention was held to be a "reasonable" seizure of the person under the Fourth Amendment. Summers so held even though, as the dissent noted, the record contained "no evidence whatsoever that the police feared any threat to their safety or that of others from the conduct of the respondent"[21] and, under the holding as the dissent read it, the police could make a person "a prisoner in his own home for a potentially very long period of time."[22]
 
 
 22
 The panel in our Mena decision justifies not applying the holding in the Supreme Court decision in Summers on the basis of a footnote in Summers:
 
 
 23
 Although special circumstances, or possibly a prolonged detention, might lead to a different conclusion in an unusual case, we are persuaded that this routine detention of residents of a house while it was being searched for contraband pursuant to a valid warrant is not such a case.[23]
 
 
 24
 We applied the Summers footnote in Franklin v. Foxworth.[24] But that really was an "unusual case." In Franklin, the detainee was an elderly man dressed only in a T-shirt, whose multiple sclerosis made him unable to walk, sit up, or control his bowels.[25] The police handcuffed him, carried him from his bed, and displayed him for an hour on a living room couch with his genitals exposed to the police, his female caretaker, and her son's girlfriend.[26] We took note of how degrading as well as unnecessary the manner of detention was.[27] That is what distinguishes Franklin from Mena. The only thing bare about Mena was her feet.
 
 
 25
 Franklin properly gives content to the Summers footnote because it really is an "unusual case" in which the manner of detention would clearly, to any reasonable police officer, go beyond the scope of any lawful justification. The detention in Franklin involved entirely gratuitous humiliation and degradation. Mena, though, is not "unusual." The detention was not unusually long, was not degrading, and lacked any especially "unusual" circumstances. For their own safety and the safety of other occupants, reasonable police officers cannot be held to know that it violates the Constitution to detain for two or three hours a woman fully dressed except for bare feet during a lawful search of a house with many padlocked doors, known to house a member of a gang involved in a drive-by shooting. The Mena panel says that "it was clear" that she could be no threat,[28] but nothing in the opinion explains why a young woman could be no threat were she not effectively controlled. If the footnote in Summers can be extended to this case, the holding of Summers is deprived of any force. More important, under Mena, it is hard to see how police officers could ever conduct a safe and effective search of a home pursuant to a valid search warrant.
 
 
 26
 The officers here deserve qualified immunity because a person who is constitutionally detained does not have a constitutional right not to be asked whether she is a citizen. And they deserve qualified immunity because when officers are executing a search warrant, they may constitutionally detain the occupants of the premises while the search is being conducted. And they deserve qualified immunity because a reasonable police officer would not have anticipated that the Ninth Circuit would rule to the contrary on both of these issues.
 
 
 
 Notes:
 
 
 [1]
 The Honorable Glenn L. Archer, Jr., Senior Circuit Judge for the United States Court of Appeals for the Federal Circuit, sitting by designation
 
 
 [1]
 Mena v. Muehler, 332 F.3d 1255, 1264 (9th Cir.2003) (emphasis added).
 
 
 [2]
 Id.
 
 
 [3]
 Mena argued in her brief that the questioning was "intrusive" but never suggested that it rose to the level of a constitutional violation
 
 
 [4]
 See, e.g., 8 U.S.C. § 1326.
 
 
 [5]
 Mena, 332 F.3d at 1264.
 
 
 [6]
 Martinez-Camargo v. INS, 282 F.3d 487 (7th Cir.2002).
 
 
 [7]
 Id. at 493.
 
 
 [8]
 United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).
 
 
 [9]
 United States v. Montero-Camargo, 208 F.3d 1122 (9th Cir.2000) (en banc).
 
 
 [10]
 Brignoni-Ponce, 422 U.S. at 879, 95 S.Ct. 2574 (emphasis added).
 
 
 [11]
 Id. at 883, 95 S.Ct. 2574.
 
 
 [12]
 Montero-Camargo, 208 F.3d at 1139.
 
 
 [13]
 Saucier v. Katz, 533 U.S. 194, 201-05, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).
 
 
 [14]
 Michigan v. Summers, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981).
 
 
 [15]
 Mena, 332 F.3d at 1262.
 
 
 [16]
 Id.
 
 
 [17]
 Id. at 1263.
 
 
 [18]
 Summers, 452 U.S. at 705, 101 S.Ct. 2587.
 
 
 [19]
 Id. at 702-03, 101 S.Ct. 2587.
 
 
 [20]
 Id. at 703, 101 S.Ct. 2587.
 
 
 [21]
 Id. at 708 n. 1, 101 S.Ct. 2587 (Stewart, J., dissenting).
 
 
 [22]
 Id. at 711, 101 S.Ct. 2587.
 
 
 [23]
 Id. at 705 n. 21, 101 S.Ct. 2587.
 
 
 [24]
 Franklin v. Foxworth, 31 F.3d 873 (9th Cir.1994).
 
 
 [25]
 Id. at 874.
 
 
 [26]
 Id. at 875.
 
 
 [27]
 Id. at 878.
 
 
 [28]
 Mena, 332 F.3d at 1263.
 
 
 
 27
 GOULD, Circuit Judge, with whom Circuit Judges KOZINSKI and TALLMAN join, dissenting from denial of rehearing en banc:
 
 
 28
 I would have reheard this case en banc.
 
 
 29
 First, I disagree with the panel's suggestion that the Constitution is offended by police officers asking Ms. Mena a question about her citizenship. I would follow Martinez Camargo v. INS, 282 F.3d 487 (7th Cir.2002), holding that a question is not a seizure. Id. at 493. Further, even if the Fourth Amendment can be invoked by a query, here the officers had a reasonable basis upon which to inquire, for Ms. Mena was found in a den of thieves, with a gang known by the law to be comprised largely of illegal immigrants. In law, as in life, a person to a degree may be judged by the company they keep, see, e.g., Maryland v. Pringle, 540 U.S. 366, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003), and nothing in the Fourth Amendment contravenes this common observation of humankind.
 
 
 30
 Second, the issue of excessive force may be close because of the duration of time that the officers left handcuffs on Ms. Mena. But on this issue we cannot say that a reasonable officer should not have done so. We should instead be more alert to the officers' legitimate concerns for safety. Given the arms anticipated at the locale of the search, and the need to avoid deadly surprise, we should not say that the Constitution precludes ensuring that any person found in potential proximity to weapons is restrained from finding and using a gun on the police. Law enforcement must confront certain unavoidable dangers, but the Constitution does not require that they face avoidable ones.[1]
 
 
 31
 Third, because in this context there was no violation of the Constitution in regard to the questions posed to Ms. Mena on her citizenship, or in regard to the degree of force used to detain and restrain her, under Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), that is the end of the analysis, and we need not go further to assess qualified immunity. But were I to assume a violation of the Fourth Amendment rights that Ms. Mena asserts on either of the above grounds,[2] then I would agree with my colleague Judge Kleinfeld that qualified immunity would be required because no "clearly established" right has been violated.
 
 
 32
 For these reasons I respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 The majority's preoccupation with whether Ms. Mena was in pajamas when restrained is besides the point. She was not paraded naked or in humiliating pose. The officers were entitled to restrain her for their safety, whether she was wearing a formal gown or jeans, whether she was wearing pajamas or sweat pants, and without regard to the majority's purported interest in her attire, which seems here to be a mere rhetorical device, wholly unrelated to the substance of the case
 
 
 [2]
 Ms. Mena did not assert that the inquiry on her citizenship status violated her rights. She challenged excessive force in restraint and challenged a search of her purse for papers. The idea that the question about her citizenship posed to Ms. Mena offended her constitutional rights, by analogy to our precedent prohibiting racial profiling as a basis for a car stop,see United States v. Montero-Camargo, 208 F.3d 1122 (9th Cir.2000) (en banc); see also United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), is extemporaneous, unbriefed, and unwise.